# United States Court of Appeals for the Federal Circuit

05-1337

PANDUIT CORPORATION,

Plaintiff-Appellant,

v.

HELLERMANNTYTON CORPORATION,

Defendant-Appellee.

Richard E. Rice, Oliff & Berridge, PLC, of Alexandria, Virginia, argued for plaintiff-appellant. With him on the brief were James A. Oliff, Eric W. Schweibenz, and Vu Q. Bui. Of counsel on the brief were Patrick G. Burns, Greer, Burns & Crain, Ltd., of Chicago, Illinois, and Robert A. McCann, Panduit Corporation, of Tinley Park, Illinois.

Joseph A. Kromholz, Ryan, Kromholz & Manion, S.C., of Milwaukee, Wisconsin, argued for defendant-appellee. With him on the brief was Daniel R. Johnson.

Appealed from: United States District Court for the Northern District of Illinois

Senior Judge Harry D. Leinenweber

# United States Court of Appeals for the Federal Circuit

05-1337

PANDUIT CORPORATION,

Plaintiff-Appellant,

v.

HELLERMANNTYTON CORPORATION,

Defendant-Appellee.

————————————————

DECIDED: June 12, 2006

————————————————

Before MICHEL, Chief Judge, GAJARSA, and LINN, Circuit Judges.

LINN, Circuit Judge.

Panduit Corporation ("Panduit") appeals from a final order dismissing its claims with prejudice after the district court granted HellermannTyton Corporation's ("HellermannTyton") motion for summary judgment that HellermannTyton did not breach provisions of the Settlement Agreement that ended a prior infringement suit involving U.S Patent No. 5,998,732 ("the '732 patent"). See Panduit Corp. v. HellermannTyton Corp., No. 03 C 8100 (N.D. Ill. Mar. 22, 2005) (final order); Panduit Corp. v. HellermannTyton Corp., No. 03 C 8100 (N.D. Ill. Feb. 9, 2005) (summary judgment). Because no genuine issue of material fact exists and HellermannTyton is entitled to judgment as a matter of law, we affirm.

## I.  BACKGROUND

The '732 patent involves a "modular offset power box and communication extension" for a "multi-channel power and communication wiring and raceway system." Multi-channel wiring raceway systems are commonly used when installing power and communications conductors within the same duct running throughout the walls of an office building.  Raceway systems help provide work spaces with power outlets and phone lines to run equipment like computers, fax machines, phones, and printers.  The present invention facilitates adjustment within the raceway system to add or remove outlets or wiring at a given work space as desired.  In prior art raceway systems, adjustments to accommodate changes in business needs or technology were difficult and time consuming.

One advantage of the raceway system disclosed in the '732 patent is to allow power conductors disposed in the raceway to be quickly and easily routed into a power box 12 while keeping the power conductors isolated from the communication channel 18.  This system of routing avoids interference and helps speed installation.  A view of this system is shown in Figure 2 of the '732 patent, reproduced below.



FIG.2

The system is recited in claim 1, which is representative of the claims on appeal.

At issue are the structural limitations of the offset power box, which are highlighted below.

1. A modular raceway outlet station for use with a trunking duct which has a divider wall and a top access opening comprising:
   an offset power box having,
   a projection extending laterally from a top wall of the offset power box having a top portion and an abutment portion depending from a furthest extent of the top portion adapted to be disposed substantially aligned with an adjacent edge of the top access opening; and
   an opening formed in the abutment portion of the projection is in communication with an aperture formed in a side wall of the offset power box adjacent the duct; and
   a communication extension adapted to be disposed over the duct top access opening having,
   an abutment surface depending from a top surface of the extension adapted to be disposed flush against the abutment portion of the projection;
   a routing notch formed in the abutment surface and
   a guide wall depending from the extension interiorly adjacent the routing notch, adapted to be substantially vertically aligned with a divider wall,
   wherein power conductors may be routed out of and over the duct, through the routing notch, and opening, and into the offset power box before installation of the extension, such that the power

05-1337                                    3

conductors are isolated from communication conductors when the extension is installed.

'732 patent, col. 7, ll. 14-41 (emphasis added).

The preferred embodiment depicts the offset power box 12 with a top wall 38, a pair of sidewalls 40, a pair of end walls 42, a pair of interior end walls 43, an interior sidewall 41 opposite the duct 18 and a bottom wall 44. The interior of the box 46 accommodates the installation of a power outlet 50. Projection 66 laterally extends from the box 12 toward the trunking duct 18. The "abutment portion" 74 vertically depends from the furthest lateral extent of the "top portion" 68 such that it is substantially vertically aligned with the adjacent edge 29 of the duct top access opening 28. The opening in the side wall, or "aperture" as the claim recites, abuts the trunking duct when the box is in place and, along with the opening in the abutment portion, allows the electrical wires to pass out of the box and into the duct, as seen in Figure 4 of the '732 patent, reproduced below.



FIG. 4

In 2001, Panduit filed suit against HellermannTyton alleging infringement of the '732 patent in view of a power box that HellermannTyton was then selling labeled "Part No. MCR-SEB," depicted in the drawing figure below and referred to as the "previous design." Shortly thereafter, the parties entered into a Settlement Agreement ("Agreement") to end the litigation, whereby HellermannTyton agreed not to make or sell "Subject Products." The Agreement defined "Subject Products" in ¶ 1(b)(i) as "the HellermannTyton Multi-Channel Raceway Side Electric Box (HellermannTyton Part No. MCR-SEB)" and in ¶ 1(b)(ii) as "all products, existing now or in the future, covered by any claim of the Panduit Patent." In exchange, Panduit waived its claims against HellermannTyton for infringement of the '732 patent prior to the date of the Agreement.



PREVIOUS DESIGN

In 2003, Panduit filed suit against HellermannTyton for breach of ¶ 1(b)(i) and ¶ 1(b)(ii) of the Agreement and for infringement of the '732 patent based on HellermannTyton's sale of the product depicted in the drawing below and designated as the "revised design." The only difference between the previous design and the revised

design is that the wall abutting the trunking duct in the revised design is solid with no cutaway.



REVISED DESIGN

In February 2004, the district court stayed litigation of the infringement claim pending the outcome of a reexamination proceeding at the United States Patent and Trademark Office. However, the district court allowed the breach of contract claim to proceed. On August 10, 2004, the district court construed several limitations of claim 1, including the phrases "a <u>projection</u> extending laterally from a top wall of the offset power box" (the "projection" limitation); "a projection . . . having . . . an <u>abutment portion</u> depending from a furthest extent of the top portion adapted to be disposed substantially aligned with an adjacent edge of the top access opening" (the "abutment portion" limitation); "an <u>opening</u> formed in the abutment portion of the projection" (the "opening" limitation); and "an <u>aperture formed in a side wall</u> of the offset power box" (the "aperture formed in a side wall" limitation).

On February 9, 2005, the district court issued an order granting HellermannTyton's motion for summary judgment on the contract claim. First, the

district court ruled as a matter of law that the accused device was not the same as the previous design and thus was not covered by ¶ (1)(b)(i) of the Agreement, dismissing Panduit's argument that the accused device was the same "in all material respects" as the 2001 device. Second, the district court ruled as a matter of law that the accused device did not infringe the '732 patent either literally or under the doctrine of equivalents and thus did not breach ¶ (1)(b)(ii) of the Agreement. The district court found that the accused device was missing the "projection," "abutment portion," and "opening" limitations. Although briefed to the district court by both parties, the court did not address the issue of whether the "aperture formed in a side wall" limitation read on the accused device. The district court then entered a final order disposing of all remaining claims. Panduit timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

On appeal, Panduit challenges the district court's grant of summary judgment that HellermannTyton did not breach either ¶ (1)(b)(i) or ¶ (1)(b)(ii) of the Agreement.

## II. DISCUSSION

### A. Standard of Review

"Generally, interpretation of a settlement agreement is not an issue unique to patent law, even if arising in the context of a patent infringement suit." Novamedix, Ltd. v. NDM Acquisition Corp., 166 F.3d 1177, 1180 (Fed. Cir. 1999). Accordingly, we apply the law of the appropriate circuit, which in this case is the Seventh Circuit. See Waymark Corp. v. Porta Sys. Corp., 334 F.3d 1358, 1362 (Fed. Cir. 2003). In the Seventh Circuit, a district court's grant of summary judgment is reviewed de novo. Davis v. Con-Way Transp. Cent. Express, Inc., 368 F.3d 776, 782 (7th Cir. 2004). Summary judgment is proper only if there are no genuine issues of material fact and the

movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In determining whether there is a genuine issue of material fact, all facts and inferences are viewed in the light most favorable to the party opposing the motion. Davis, 368 F.3d at 782. Summary judgment is appropriate only when there is no genuine issue as to any material fact and where the moving party is entitled to judgment as a matter of law. Id.

Contract interpretation is ordinarily governed by state law. Unova, Inc. v. Acer Inc., 363 F.3d 1278, 1280 (Fed. Cir. 2004) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Jr. Univ., 489 U.S. 468 (1989)). Here, the Agreement expressly provides that Illinois law governs interpretation. We therefore apply Illinois contract law principles to our interpretation of the Agreement. See id. Under Illinois law, interpretation of a contract is a question of law, which appellate courts review de novo. See Lumpkin v. Envirodyne Indus., Inc., 933 F.2d 449, 456 (7th Cir. 1991).

The breach determination requires that we assess whether HellermannTyton's redesigned product infringes the '732 patent. Claim construction is an issue of law, see Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996), that we review de novo. See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc); Phillips v. AWH Corp., 415 F.3d 1303, 1328 (Fed. Cir. 2005) (en banc). Infringement, whether literal or under the doctrine of equivalents, is a question of fact. Ferguson Beauregard v. Mega Sys., Inc., 350 F.3d 1327, 1338 (Fed. Cir. 2003). The determination of infringement under the doctrine of equivalents is limited by two primary legal doctrines, prosecution history

estoppel and the "all elements" rule, the applications of which are questions of law. Seachange Int'l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1378 (Fed. Cir. 2005).

## B. Analysis

### 1. Agreement ¶ 1(b)(i)

The district court found that because ¶ 1(b)(i) of the Agreement clearly and unambiguously defines "Subject Product" as one, specific product (Part No. MCR-SEB), and because Panduit "does not dispute that the Accused Product is not physically the same product as [Part No. MCR-SEB]," HellermannTyton was entitled to summary judgment that it did not breach ¶ 1(b)(i).

Panduit points first to Foster v. Hallco Manufacturing Co., 947 F.2d 469 (Fed. Cir. 1991) and KSM Fastening Systems, Inc. v. H.A. Jones Co., 776 F.2d 1522 (Fed. Cir. 1985), to argue that the district court should have read ¶ 1(b)(i) to encompass the Part No. MCR-SEB product and "any accused product having only colorable changes or changes unrelated to the patent claim." Panduit asserts that the accused product is only "colorably different" from Part No. MCR-SEB, and that according to Foster and KSM, it is covered by ¶ 1(b)(i). Alternatively, Panduit argues that the agreement is ambiguous and that to effectuate the parties' intent to settle the litigation, we must interpret ¶ 1(b)(i) to encompass the accused product. HellermannTyton counters that because the Agreement did not follow an adjudication on the merits, because no injunction issued, and because no consent judgment was entered, Foster and KSM are distinguishable, the patent doctrine of "insubstantial differences" does not apply, and there should be no comparison between the Part No. MCR-SEB product and the

accused device. HellermannTyton also counters that there is no dispute that the accused device is not Part No. MCR-SEB and that the district court's ruling was correct.

We disagree with Panduit's contention that Foster and KSM apply to the Agreement, and conclude that these cases are distinguishable. In KSM, an injunction barred products "of the type and nature identified by the Plaintiff in its Complaint," and the parties did not dispute that the injunction "is enforceable against devices other than the specific [] device of the original suit." 776 F.2d at 1527. We held that it would not be appropriate to bring contempt proceedings for violating such an injunction if there was more than a colorable difference between an accused and adjudged device. Id. at 1530-32. Similarly, the parties in Foster agreed to a consent judgment that found infringement, but made no reference to a specific product or device. 947 F.2d at 422. In that case, we noted that a new cause of action was not presented if an accused device and an adjudged device were essentially the same. Id. at 479-80. Here, unlike in KSM and Foster, the parties entered into a settlement agreement that expressly addressed a specific product, Part No. MCR-SEB, in ¶ 1(b)(i) of the Agreement. Our inquiry is not a comparison between an accused and an adjudged device, but rather the interpretation of that express provision.

Under Illinois law, the plain language of the Agreement governs. Lumpkin, 933 F.2d at 456. If contract terms are unambiguous, then the inquiry is over. Id. However, if the language of the contract is ambiguous, then the court may consider extrinsic evidence to determine the intent of the parties. Id.

In this case, ¶ 1(b)(i) of the Agreement states that HellermannTyton must cease marketing "Subject Products," which includes "the HellermannTyton Multi-Channel

Raceway Side Electric Box (HellermannTyton Part No. MCR-SEB)." The question is what is meant by reference in the agreement to Part No. MCR-SEB. Panduit asserts that the contract contemplates that Part No. MCR-SEB includes not only that exact product, but also devices with "merely colorable" differences from Part No. MCR-SEB. HellermannTyton interprets ¶ 1(b)(i) as including only the specific device identified as Part No. MCR-SEB.

We agree with the district court and HellermannTyton that ¶ 1(b)(i) covers only the specific device identified as Part No. MCR-SEB. The language of the Agreement is unambiguous. By its express terms, ¶ 1(b)(i) does not include "colorable changes," modifications, or variations, but mentions only Part No. MCR-SEB. Settlement agreements, like consent judgments, reflect an agreement by hostile litigants on more than just contract terms; they reflect a compromise of contested legal positions in matters that are the subject of litigation. See United States v. Armour & Co., 402 U.S. 673, 681-82 (1971) ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms."); Thatcher v. Kohl's Dep't Stores, Inc., 397 F.3d 1370, 1373-75 (Fed. Cir. 2005) (applying Illinois law, "[t]he consent judgment serves as a carefully crafted settlement agreement between the parties"). Because the language of the Agreement is not ambiguous, we do not look to the parties' intent to include terms that are absent.

> [T]he parties have purposes, generally opposed to each other, and the resultant [settlement agreement] embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a [settlement agreement] must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.

<u>Armour</u>, 402 U.S. at 681-82 ("settlement agreement" substituted for "consent decree"); <u>see also</u> <u>Thatcher</u>, 397 F.3d at 1375 ("[S]ilence [on assignment] is the functional equivalent of the parties' express intent to exclude language of assignment."). The precise and unambiguous terms of ¶ 1(b)(i) include only Part No. MCR-SEB; the district court therefore did not err in interpreting that provision.

We also agree with the district court that there is no genuine issue of material fact that the accused device is not Part No. MCR-SEB. Panduit does not dispute that the accused device is not physically the same product as Part No. MCR-SEB. HellermannTyton made the wall abutting the trunking duct in the accused device solid with no cutaway. Even viewed in a light most favorable to Panduit, there is no question that the accused product is not Part No. MCR-SEB. The district court therefore did not err in granting summary judgment that the accused device is not a "Subject Product" as defined by ¶ 1(b)(i) of the Agreement.

### 2. Agreement ¶ 1(b)(ii)

The district court ruled as a matter of law that the accused device did not infringe the '732 patent because it was missing the "opening," "projection," and "abutment portion" limitations. On appeal, Panduit argues that each limitation can be found in the accused product as shown below in Panduit's Figure 3:



FIGURE 3

Because we conclude that the accused device does not contain the "opening" limitation, and because the grant of summary judgment of no breach of ¶ 1(b)(ii) based on non-infringement was proper on that basis alone, we need not reach the other disputed claim terms.

With respect to the "opening" limitation, the district court stated in its summary judgment opinion that "the opening must be in the descended portion [of the abutment portion], and cannot be in the top portion's end portion." The court also concluded that the limitation requires a solid abutment portion and solid side wall; and that "while the '732 Patent permits substantial leniency in how wide or narrow the opening must be, the term 'formed in' means that 'the aperture and opening cannot be so wide such that the corresponding abutment portion or side wall ceases to exist.'" Although in its claim construction order the district court held that the opening need not be bounded on all sides (including the top), in analyzing the accused product, the district court held that

"the open space identified by Plaintiff clearly does not descend or hang down from any structure, and is not 'formed in' the projection's abutment portion as construed."

Panduit argues that the claims do not require that the opening descend or hang down from any structure and that the district court improperly imported this limitation from the preferred embodiment, in which the opening is bounded at the top. Specifically, Panduit argues that we must construe "formed in" consistently throughout the specification, that "formed in" means "made within a cross-section of" or "created within an exterior surface or dimension of," and that nothing requires the opening to be bounded at its top. Panduit asserts that the opening in the accused device is bounded by the two "Π"-shaped surfaces and the horizontal section, or between the inner legs of the two "Π"-shaped surfaces.

Citing the preferred embodiment, HellermannTyton counters that the opening must hang off of the top portion of the projection because it must be in the abutment portion of the projection, which itself must hang. HellermannTyton asserts that what Panduit refers to as an opening is not in a hanging portion of the structure because there is nothing from which the abutment portion hangs. Moreover, HellermannTyton argues that because the horizontal structure and two "Π"-shaped surfaces are not co-planar, there is no "opening formed in" the abutment.

In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence. See Phillips, 415 F.3d at 1312-17. Here, the "opening" limitation is defined by two recitations in the claim language. First, the opening must be formed in an abutment portion of the projection. To be

"formed in" an abutment portion of the projection requires us to determine the location of an abutment portion. According to the claim, an abutment portion is located to "depend[] from the furthest extent of the top portion" of the projection. See '732 patent, col. 7, ll. 19-21. Although Panduit challenges what constitutes an abutment portion, it does not dispute that to depend from the top portion, an abutment portion must hang down or descend from such top portion. We agree. Therefore, to be "formed in" an abutment portion, the opening must be formed in an area that hangs down—i.e., extends downward—from a top portion of the projection. Second, the claim language requires that the opening be "in communication" with an aperture formed in the side wall. We agree with the district court—and the parties do not dispute—that "in communication" simply requires a passage through which wires may be routed.

This construction is consistent with the written description, which describes "an opening formed in the abutment portion of the projection which is in communication with an aperture formed in a side wall" and an abutment portion "which depends from the furthest extent of the top portion." '732 patent, col. 2, ll. 30-36. Although in the preferred embodiment depicted in Figure 4, the aperture 82 formed in the side wall 40 is not bounded at the top, this does not suggest that the opening 80 formed in the abutment portion 74 does not require a top portion. See '732 patent, col. 4, ll. 46-52. An "abutment portion," unlike a "side wall," is described consistently by both the claim language and the written description as depending—i.e., extending downward—from a top portion of the projection. '732 patent, col. 2, ll. 30-31, col. 7, ll. 19-21. To be "formed in" an area that extends downward from a top portion of the projection

necessarily requires that the opening be bounded at top. The prosecution history is consistent with this interpretation and provides no further guidance.

For the foregoing reasons, we conclude that the "opening" must be formed in an area that extends downward from a top portion of the projection and must provide a passage through which wires may pass.

Comparing the properly construed claim to the accused device, see Cybor Corp., 138 F.3d at 1454, we note that neither of the two openings argued by Panduit qualify as an "opening" according to the language of the claim. First, the openings bounded on three sides by each "Π"-shaped surface fail to meet the "opening" limitation. Although these openings are "formed in" an abutment portion, the openings and the aperture are not "in communication" because wires cannot pass through either of these openings and into an aperture in the side wall. Second, the open space between each of the "Π"-shaped surfaces fails. Although this open space may be "in communication" with an aperture in the side wall, it does not extend downward from a top portion of the projection, and therefore is not "formed in" the abutment portion.

Moreover, even if the horizontal surface argued by Panduit is included as part of the abutment portion, the accused device would still not meet this limitation. The abutment portion is located extending downward from a top portion of the projection. Accordingly, for the horizontal surface to be considered an "abutment portion," the top surface of the curved flange must be considered a top portion of the projection. The opening argued by Panduit would therefore occur above the top portion of the projection and not be formed in the abutment portion at all. We agree with the district court that

there is no genuine issue of material fact that the accused device does not literally infringe the '732 patent.

Moreover, the doctrine of equivalents cannot be applied here.  Application of the doctrine of equivalents is limited by the "all elements rule," which provides that "the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation."  Asyst Techs., Inc. v. Emtrak, Inc., 402 F.3d 1188, 1195 (Fed. Cir. 2005) (citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29 (1997)).  Claim 1 of the '732 patent requires an opening in an abutment portion through which wires may pass from a trunking duct into an offset power box.  To extend the scope of the claim to encompass an accused device in which wires bypass the abutment portion altogether would necessarily read the "opening" limitation out of the claim.  See Novartis Pharm. Corp. v. Eon Labs Mfg., 363 F.3d 1306, 1312 (Fed. Cir. 2004) (holding that a particulate dispersion inside the body cannot infringe under the doctrine of equivalents because it would vitiate the claimed requirement that the dispersion be prepared outside the body).  The doctrine of equivalents cannot be applied because it would vitiate the "opening" limitation of the claim.

Because we conclude that the accused device does not infringe claim 1 of the '732 patent, the district court did not err in granting summary judgment that the accused device is not a "Subject Product" as defined by ¶ 1(b)(ii) of the Agreement.

## III.  CONCLUSION

Because we find that there is no genuine issue of material fact that the accused device does not meet the plain language of ¶ 1(b)(i), or infringe claim 1 of the '732

patent as specified in ¶ 1(b)(ii), the district court's grant of summary judgment that HellermannTyton did not breach the Agreement is

<u>AFFIRMED</u>.
