**RETIREMENT COMMUNITIES LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 09–343 C.**

United States Court of Federal Claims.

May 19, 2010.

Steven L. Reed, Washington, DC, for plaintiff. Douglas P. Hibshman, Washington, DC, of counsel.

Russell A. Shultis, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Jean Hardin, Federal Emergency Management Agency, Washington DC, of counsel.

## OPINION AND ORDER

HEWITT, Chief Judge.

Following Hurricane Ivan and other storms, Retirement Communities LLC (Retirement Communities or plaintiff) entered into Lease No. EMA–HFSE04–05–L–4177 (Lease) with the United States government acting through the Federal Emergency Management Agency (FEMA, the United States, the government, or defendant) to lease residential property in Pensacola, Florida (Property). The parties have filed cross-motions for summary judgment to determine whether the government was required to pay water and sewage connection and impact fees (Utility Fees) to Emerald Coast Utilities Authority (ECUA) by the terms of the Lease.

I. Background

Before the court are Defendant's Motion for Summary Judgment (defendant's Motion or Def.'s Mot.), docket number (Dkt. No.) 14, filed December 7, 2009; Defendant's Proposed Findings of Uncontroverted Fact (defendant's Facts or Def.'s Facts), Dkt. No. 15, filed December 7, 2009, accompanied by three exhibits (defendant's Exhibit(s) or Def.'s Exh(s).); Plaintiff's Cross Motion for Summary Judgment (plaintiff's Motion or

Pl.'s Mot.), Dkt. No. 16, filed December 7, 2009, accompanied by eight exhibits (plaintiff's Exhibit(s) or Pl.'s Exh(s).); Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact (defendant's Response to Facts or Def.'s Resp. Facts), Dkt. No. 21, filed January 29, 2010; Defendant's Response to Motion for Summary Judgment (defendant's Response or Def.'s Resp.), Dkt. No. 22, filed January 29, 2010; Plaintiff's Response to Defendant's Motion for Summary Judgment and an accompanying Memorandum of Points and Authorities in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment (plaintiff's Response or Pl.'s Resp.), Dkt. No. 23, filed January 29, 2010; Defendant's Reply to Response to Motion for Summary Judgment (defendant's Reply or Def.'s Reply), Dkt. No. 26, filed February 12, 2010; and Plaintiff's Reply to Defendant's Response to Plaintiff's Cross Motion for Summary Judgment (plaintiff's Reply or Pl.'s Reply), Dkt. No. 27, filed February 12, 2010. The court held oral arguments on Tuesday, April 6, 2010. *See* Order of March 12, 2010, Dkt. No. 28; Oral Argument Transcript (Tr.), Dkt. No. 30.

In support of their positions, the parties each submitted identical copies of the Lease, the Lease Rider and Lease Addendum A, *see* Def.'s Exh. 2; Pl.'s Exh. 1; identical copies of the Declaration of Stephen E. Sorrell (Sorrell Declaration or Sorrell Decl.), *see* Def.'s Exh. 3 at 1–3; Pl.'s Exh. 5 at 1–3; and identical copies of the ECUA Board Report, *see* Def.'s Exh. 3 at 4–8; Pl.'s Exh. 5 at 4–8. Because the parties submitted identical copies of the Lease, Lease Rider, Lease Addendum A, the Sorrell Declaration and the ECUA Board Report, the court will cite directly to these documents rather than to the parties' exhibits.

Five provisions in the Lease bear on the responsibility of the government as lessee: (1) the government was "responsible for direct payment of all utility bills," Lease Addendum A, ¶ B; (2) the government was to "leave any infrastructure installed as requested by the lessor," Lease Addendum A, ¶ F; (3) the government was responsible for "the construction of improvements (including … utilities …) as the Government deter-

mines necessary and/or expedient in connection with the establishment and operation of temporary housing facilities," Lease Rider ¶ 2; (4) the government was required "to install sewer, water, electrical utilities … as may be necessary and/or convenient to establish and operate temporary housing facilities," Lease Rider ¶ 3; and (5) the government agreed that "all real estate improvements shall inure to [plaintiff] at the end of the Lease term," Lease Rider ¶ 5. *See* Tr. 5:17–6:4, 9:5–16, 10:10–11:7, 11:20–25 (Mr. Reed).

Retirement Communities filed its Complaint (Complaint or Compl.) on May 28, 2009. *See* Dkt. No. 1. In its Complaint, plaintiff asserts that "[t]he Government constructively changed and negated its obligations under the terms of the Lease" and that plaintiff "is entitled to an equitable adjustment of $170,829 as a result of this constructive change." Compl. ¶ 26. Plaintiff further asserts that "[t]he Government breached its express and implied contractual obligations under the terms of the Lease … when it failed to ensure that the water and sewer services of the Property were *intact and operational* at the end of the lease term" and that it is "entitled to breach of contract damages of $170,829." Compl. ¶ 27 (emphasis added).

## II. Legal Standards

### A. Jurisdiction

In the Tucker Act, Congress authorized the United States Court of Federal Claims to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006). Plaintiff's claim is brought under the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613 (2006).

■ The CDA requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer

for a decision." 41 U.S.C. § 605(a) (2006). Jurisdiction is appropriate under the CDA when a contractor "submit[s] in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maint., Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987). Retirement Communities submitted a written claim to the Contracting Officer (CO) on April 4, 2008, giving adequate notice of the basis and amount of the claim. Pl.'s Exh. 7 at 1. The CO denied the claim in its entirety on May 30, 2008. *See* Pl.'s Exh. 8. Plaintiff met the jurisdictional requirements of the CDA by timely appealing the denial of its written, certified claim. *See* 41 U.S.C. § 609(a) (allowing contractor to bring an action directly in the United States Court of Federal Claims within twelve months of receipt of CO's decision).

**B. Cross Motions for Summary Judgment**

■■■ Under Rule 56 of the Rules of the Court of Federal Claims (RCFC), summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[1] RCFC 56(c); *see Anderson v. Liberty Lobby, Inc. (Anderson),* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (reviewing Rule 56(c) of the Federal Rules of Civil Procedure (FRCP)); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1302 (Fed.Cir.2005). A fact is material if it might significantly affect the outcome of the litigation. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A

dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See id.; Matsushita Elec. Indus. Co. v. Zenith Radio Corp. (Matsushita),* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that there is no genuine dispute "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

> In considering such a motion, the court will, absent persuasive reason to the contrary, deem the material facts claimed and adequately supported by the moving party to be established, except to the extent that such material facts are controverted....

RCFC 56(c)(1). Further, under RCFC 56, the court must draw all inferences from the facts before it in the light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Mann v. United States,* 334 F.3d 1048, 1050 (Fed.Cir.2003) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). Whether a contract creates a duty is a legal question of contract interpretation, and therefore one that is amenable to summary judgment. *San Carlos Irrigation & Drainage Dist. v. United States (San Carlos),* 877 F.2d 957, 959 (Fed.Cir.1989); *see Varilease Tech. Group, Inc. v. United States,* 289 F.3d 795, 798 (Fed.Cir.2002) ("Contract interpretation is a question of law generally amenable to summary judgment.").

**C. Constructive Change**

■■■ Plaintiff contends that the government constructively changed its obligations under the contract and that plaintiff is therefore entitled to an equitable adjustment. Compl. ¶ 26. "A constructive change occurs

---

1. The Rules of the United States Court of Federal Claims (RCFC) were amended after the parties filed cross motions for summary judgment; the amended RCFC became effective on January 11, 2010. No changes to the RCFC affect the analysis or outcome of the matters addressed in this Opinion and Order.

 The RCFC generally mirror the Federal Rules of Civil Procedure (FRCP). RCFC 56 rules committee notes (2002 rev.) ("The subdivision structure of RCFC 56 was reordered to more closely conform to FRCP 56."); *see Flowers v. United States,* 75 Fed.Cl. 615, 624 (2007) ("RCFC 56 is patterned on Rule 56 of

the [FRCP] and is similar in language and effect."); *see also C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1541 n. 2 (Fed.Cir. 1993) ("The [RCFC] generally follow the [FRCP]. [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c)."). Therefore, the court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56. *Champagne v. United States,* 35 Fed.Cl. 198, 205 n. 5 (1996) ("In general, the rules of this court are closely patterned on the [FRCP]. Therefore, precedent under the [FRCP] is relevant to interpreting the rules of this court, including Rule 56.")

where a contractor performs work beyond the contract requirements, without a formal order under the changes clause, either by an informal order of the Government or by fault of the Government." *Miller Elevator Co. v. United States (Miller Elevator),* 30 Fed.Cl. 662, 678 (1994).

A constructive change entails two base components, the change component and the order or fault component. The "change" component describes work outside of the scope of the contract, while the "order/fault" component describes the reason that the contractor performed the work.

*Id.* (citing *Embassy Moving & Storage Co. v. United States,* 191 Ct.Cl. 537, 545, 424 F.2d 602, 607 (1970); *Al Johnson Constr. Co. v. United States (Al Johnson),* 20 Cl.Ct. 184, 204 (1990)). "To recover on its constructive change claim, [plaintiff] must prove that the [government] ordered it to [perform additional work] and that this work was not required under the contract." *Al Johnson,* 20 Cl.Ct. at 204 (citing *Len Co. & Assocs. v. United States,* 181 Ct.Cl. 29, 385 F.2d 438, 443 (1967)).

■■■■ Equitable adjustments are a form of corrective measure that the government undertakes to make a contractor whole when the government modifies a contract. *Int'l Data Prods. Corp. v. United States,* 492 F.3d 1317, 1325 (Fed.Cir.2007) (citing *Ets–Hokin Corp. v. United States,* 190 Ct.Cl. 668, 420 F.2d 716, 720 (1970)). The contractor bears the burden of proving its damages with sufficient certainty, *see Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 767 (Fed.Cir. 1987) (requiring plaintiff to prove damages with sufficient certainty), and proving that the government required it to perform work outside the terms of the contract, *see Miller Elevator,* 30 Fed.Cl. at 678–79.

Plaintiff contends that the government was required to leave the water and sewer services intact and operational at the end of the Lease term and that, when the government failed to do this, it constructively changed the terms of the Lease. Compl. ¶ 26. Plaintiff contends that, because it is required to pay the Utility Fees, it is being required to perform work beyond the Lease requirements

due to the fault of the government. *See* Pl.'s Mot. 29. However, plaintiff was required, under the terms of the Lease, only to serve as landlord and to provide land suitable for temporary housing. *See Prudential Ins. Co. of America v. United States,* 801 F.2d 1295, 1298 (Fed.Cir.1986) (applying general federal law and principles of contract law and landlord-tenant law when the government leased property from a private party). There is a complete lack of evidence that the government required plaintiff to provide additional services or perform additional work during the term of the Lease. Because plaintiff was not required to perform work beyond the contract requirements, *see Miller Elevator,* 30 Fed.Cl. at 678, the government did not constructively change the contract, and plaintiff is not entitled to an equitable adjustment on that basis.

D. Breach of Contract

■■■■ "To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos,* 877 F.2d at 959. "A government contractor bears the 'burden of establishing the fundamental facts of liability, causation, and resultant injury.'" *Elec. & Missile Facilities, Inc. v. United States (Elec. & Missile),* 189 Ct.Cl.237, 416 F.2d 1345, 1355 (1969) (quoting *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 351 F.2d 956, 968 (1965)).

■■■■ Contract terms are to be accorded their plain and ordinary meaning, and "[w]henever possible, courts should look to the plain language of the contract to resolve any questions of contract interpretation." (*Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.1993)). "The language of a contract ... must be given the meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Allied Tech. Group, Inc. v. United States,* 39 Fed.Cl. 125, 138 (1997) (citing *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965) (internal quotations omitted)).

The plain language of a contract is viewed as controlling and unambiguous if the language is amenable to only one reasonable interpretation. *Triax Pac., Inc. v. West,* 130 F.3d 1469, 1473 (Fed.Cir.1997). A contract will be deemed ambiguous if it is amenable to two different reasonable interpretations. *Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993). "However, contracts are not necessarily rendered ambiguous by the mere fact that the parties disagree as to the meaning of their provisions." *Id.* at 1578.

## III. Discussion

Plaintiff moves for summary judgment on the grounds that "in seeking and receiving a refund of the water and sewer impact fees ... [the government] breached and constructively changed the lease agreement." Pl.'s Mot. 3. Defendant moves for summary judgment arguing that the government has no obligation under the Lease to pay the Utility Fees. Def.'s Mot. 1. The issue before the court is whether the Lease requires the government to pay the Utility Fees. Material uncontroverted facts are discussed below, followed by plaintiff's Motion, *see* infra Part III.A, and defendant's Motion, *see infra* Part III.B.

Phillips & Jordan, Inc. (Phillips & Jordan) was the government's contractor that prepared the Property for residential use. Compl. ¶ 7; Def.'s Facts ¶ 5. During its preparatory work, Phillips & Jordan paid ECUA $146,820 in Utility Fees. Pl.'s Exh. 4 at 4; *see* Pl.'s Mot. 8. After the government refused to reimburse Phillips & Jordan for this expense, Phillips & Jordan sought a waiver of the Utility Fees and a refund of its payment. *See* Compl. ¶ 12 ("because such fees were not authorized ... under the terms of [Phillips & Jordan's] contract with the Government"). ECUA determined that the government was entitled to a deferral of the Utility Fees due to the temporary nature of the housing and returned the Utility Fees by issuing a check to Phillips & Jordan for $146,820. Pl.'s Mot. 10; Def.'s Resp. Facts ¶¶ 26–28. Stephen Sorrell, the Executive Director for ECUA, issued a declaration under oath in December 2009 explaining the situation:

When land is developed for housing purposes, ECUA assesses a one-time fee to cover initial costs to have water and sewer systems in place and to compensate for the costs of the new use of the water and sewer systems. These fees are one-time payments that are generally non-refundable ..... The total amount paid for [Utility Fees] was $146,820 for the [Property]. Representatives of FEMA approached ECUA and requested a waiver of the [Utility Fees] for the leased [Property]. Because FEMA's use of the lots being prepared by Phillips and Jordan was for temporary housing of 18 months or less, *ECUA determined that the [Utility Fees] would not be required at the present time;* instead, those fees would be collected after 18 months if the connections were still present. Attached hereto ... is an ECUA Board Report authored by me for the week of November 28 to December 2, 2005 which memorializes the decision reached. In light of the above, on February 10, 2005 ECUA reimbursed Phillips and Jordan in the amount of $146,820 for the [Utility Fees] that had been paid.

Sorrell Decl. ¶¶ 6–10 (original formatting altered) (emphasis added). The relevant section of the ECUA Board Report, referenced above by Mr. Sorrell, states:

When FEMA initiated their temporary housing projects after Hurricane Ivan, they requested the ECUA to waive [Utility Fees]. The ECUA could not agree to waive these fees, *so we agreed to defer these fees for a period of 18 months because of the temporary nature of the housing ....* At that time, we informed FEMA, after 18 months, the ECUA would have to collect those [Utility Fees] from the owners of the property, if the sites continued to be used for a trailer park or some other type of permanent housing.

ECUA Board Report 1 (emphasis added). The payment from ECUA to Phillips & Jordan has been labeled in various ways: as a "refund" by plaintiff, Tr. 13:24–25; as a "reimbursement" by Mr. Sorrell, Sorrell Decl. ¶ 10; and as a "deferral" in the ECUA Board Report, ECUA Board Report 1. Notwithstanding the different labels, it is clear, and

the parties agree, that ECUA determined that the government "would not be required" to pay the Utility Fees for the Property. *See* Sorrell Decl. ¶ 9. Because the government was not required by ECUA to pay the Utility Fees in order for the Property to receive utility service, payment of the Utility Fees was not required in order for the government "to establish and operate temporary housing facilities." *See* Lease Rider ¶ 3 (requiring the government "to install sewer, water, electrical utilities ... as may be necessary and/or convenient to establish and operate temporary housing facilities").

### A. Plaintiff's Motion for Summary Judgment

Plaintiff states that "in seeking and receiving a refund of the [Utility Fees]" the government breached the Lease. Pl.'s Mot. 2–3. Plaintiff asserts that under the terms of the Lease the government was required to install water and sewer infrastructure and that payment of Utility Fees was a necessary aspect to complete installation. *Id.* at 14. Plaintiff asserts:

> The water and sewer piping only became infrastructure when installed and capable of providing water and sewer services to each mobile home lot. Until installed and capable, the water and sewer pipes were providing no benefit to the occupants of the mobile homes. Once the water and sewer system became operational, it became "infrastructure" and useful under the plain language definition of the word. Once the water and sewer system became "infrastructure," the Government was required under the terms of the Lease Agreement to leave that "installed" "infrastructure" [sic] in place.

*Id.* at 19. Plaintiff asserts that the government therefore breached the Lease when Phillips & Jordan sought and received from ECUA a reimbursement of the Utility Fees. *Id.* at 22.

2. Plaintiff spends a significant portion of its brief arguing that the definitions of "installed" and "infrastructure" require that the pipes be working and operational at the end of the Lease. *See* Pl.'s Cross Mot. for Summ. J. (Pl.'s Mot.) *passim*. The court finds plaintiff's emphasis on definitions unhelpful. It is undisputed that ECUA reim-

Plaintiff first asserts that a "plain language, or common sense" reading of the Lease support its position. *See id.* at 18–22. In the alternative, if the court finds the plain language of the Lease ambiguous, plaintiff asserts that the intent of the parties should govern and that the parties intended "that the water and sewer infrastructure would remain working and operational at the conclusion of the Lease." *See id.* at 23–26. The court addresses each argument in turn.

### 1. Plain Language of the Lease [2]

The first relevant provision in the Lease states: "The Government shall also be responsible for direct payment of all utility bills." Lease Addendum A, ¶ B; *see* Tr. 5:19–22 (Mr. Reed). Plaintiff asserts that this provision makes the government responsible for payment of the Utility Fees. Tr. 27:6–11, 28:4–7 (Mr. Reed); *see* Pl.'s Resp. 3. The court finds that this provision required the government to pay only those utility bills that came due during the term of the Lease. ECUA considered the issue and expressly determined that the government would not be required to pay Utility Fees in order for the Property to receive water and sewer utility service for temporary housing use. *See* Sorrell Decl. ¶ 9. Further, plaintiff concedes that the government paid all utility bills that came due during the course of the Lease. *See* Tr. 33:14–16 (Mr. Reed). Accordingly, because the Utility Fees were not a utility bill that was incurred by the government during the Lease, paragraph B of Addendum A to the Lease did not require the government to pay the Utility Fees.

The second relevant Lease provision states that "the [g]overnment will leave any infrastructure installed." Lease Addendum A, ¶ F; *see* Tr. 5:23–25. The court simply does not understand how Utility Fees could be viewed as infrastructure. ECUA determined that the Utility Fees were not required to operate temporary housing on the Property.

bursed the water and sewer impact and connection fees (Utility Fees). *See* Decl. of Stephen E. Sorrell ¶¶ 9–10. It is clear, therefore, that the government was not required to pay the Utility Fees as a precondition to performance of its obligation under the Lease Rider ¶ 3 "to establish and operate temporary housing facilities."

*See* Sorrell Decl. ¶ 9. The government in fact installed the required "infrastructure," that is, water and sewer pipes to connect the individual housing units with the capped main pipeline. *Cf.* Tr. 25:1–5 (colloquy between Mr. Reed and the court) (resolving that there were no physical problems with the pipes). Consistent with the Lease, the government left this infrastructure installed and therefore this improvement to the real estate inured to plaintiff at the end of the Lease. *See id.* Accordingly, because the Utility Fees cannot be viewed as "infrastructure" that could or should have been left in place, paragraph F of Addendum A to the Lease cannot be read to require the government to pay the Utility Fees.

The third and fourth relevant provisions can be found in paragraphs two and three of the Lease Rider and govern improvements to the Property during the course of the Lease. Lease Rider ¶¶ 2–3; *see* Tr. 10:10–11:7 (colloquy between Mr. Reed and the court). The Lease contemplated that certain improvements would be made by the government. Lease Rider ¶ 2 ("Use of the Property under this Agreement shall be for construction and establishment of temporary housing facilities for disaster assistance recipients, the construction of improvements (including, but not limited to utilities . . .) as the Government determines necessary and/or expedient in connection with the establishment and operation of temporary housing facilities."). In particular, the improvements contemplated included those utilities which were necessary to operate temporary housing. Lease Rider ¶ 3 ("The parties acknowledge that the Government's use of the property hereunder shall require that the Government . . . install sewer, water, electrical utilities, and such other amenities as may be necessary and/or convenient to establish and operate temporary housing facilities."). Both paragraphs two and three of the Lease Rider limit the government's responsibility to installation of improvements that the government determines to be necessary for temporary mobile homes. *See* Lease Rider ¶¶ 2–3; *see also* Lease 1 (stating that the purpose of the Lease is to offer "mobile homes for temporary housing for the victims of Hurricane Ivan"). Neither paragraph makes any reference to fees, and both paragraphs limit the government's responsibility to the installation of infrastructure "necessary" to operate temporary housing. *See* Lease Rider ¶¶ 2–3. Under the terms of the Lease, if the government determined that payment of Utility Fees was unnecessary to operate temporary housing, the government was not required to pay the Utility Fees. *See id.* Accordingly, because the Utility Fees were not necessary to operate temporary housing, *see* Sorrell Decl. ¶ 9, paragraphs two and three of the Lease Rider did not require the government to pay the Utility Fees.

The final possibly relevant provision requires that "all real estate improvements shall inure to [plaintiff] at the end of the Lease term." Lease Rider ¶ 5; *see* Tr. 11:16–25 (Mr. Reed). ECUA determined that Utility Fees "would not be required at the present time" and returned the payment to Phillips & Jordan while continuing to provide utility service to the Property to support temporary housing. *See* Sorrell Decl. ¶¶ 9–10. Accordingly, once ECUA determined that the government was not required to pay the Utility Fees, there was no benefit that could inure to plaintiff; therefore paragraph five of the Lease Rider does not require the government to pay Utility Fees.

For the foregoing reasons, the court finds that the plain language of the Lease does not require the government to pay the Utility Fees.

### 2. Intent of the Parties

 Plaintiff asserts that the parties intended, at the time of negotiating the Lease, that the government would pay the Utility Fees. Pl.'s Mot. 23–25. As an initial matter, the court determined that there is no ambiguity in the Lease that would support the court's reliance on evidence outside the four corners of the Lease. *See supra* Part III. A.1. In this case, the terms of the Lease are clear, therefore the intent of the parties is irrelevant. *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed.Cir.2004); *see Panduit Corp. v. HellermannTyton Corp.*, 451 F.3d 819, 827 (Fed.Cir.2006) (applying Illinois contract law). The court looks

at the intent of the parties at the time the Lease was executed only if there is an ambiguity in the terms. *See King v. Dep't of Navy,* 130 F.3d 1031, 1033 (Fed.Cir.1997); *Conant v. Office of Pers. Mgmt.,* 255 F.3d 1371, 1376 (Fed.Cir.2001).

In support of its assertion, plaintiff submits the Declaration of Warren E. Higginbotham (Higginbotham Declaration or Pl.'s Exh. 3, Higginbotham Decl.). Mr. Higginbotham states:

> Because the 60 mobile home lots were not equipped with water and sewer infrastructure before we entered the lease agreement with FEMA, I specifically requested to the [General Services Administration] Contracting Officer that FEMA be required to provide the necessary water and sewer connections from each lot's lateral water and sewer lines to each of the 60 mobile home lots, and that FEMA pay the [Utility Fees] to provide each lot with water and sewer services if required to do so by ECUA. It was my understanding when I made this request that the [Utility Fees] only needed to be paid once to the ECUA, and that these fees were non-refundable. As part of our negotiations, I wanted to benefit from any infrastructure enhancements that FEMA had to make and therefore, all such enhancements (including these [Utility Fees]) would be passed on to [plaintiff] as partial payment for our leasing the property to FEMA. In so doing, we would be able to sell the lots after the FEMA lease period at a lower, more attractive price. By negotiating in this manner, it was my expectation that all water and sewer piping installed by FEMA would remain working and operational after the lease agreement ended.... I made it abundantly clear during the negotiations that we wanted the water and sewer infrastructure installed by FEMA to each mobile home lot to remain intact and operational at the end of the lease agreement.

Pl.'s Exh. 3, Higginbotham Decl. ¶¶ 10–13 (original formatting altered).

■ The court does not doubt that Mr. Higginbotham hoped that plaintiff would benefit from the government's payment of the Utility Fees. *See id.* Mr. Higginbotham stated that "[he] wanted to benefit from any infrastructure enhancements" and that "it was [his] expectation that all water and sewer piping ... would remain working and operational." *Id.* ¶¶ 11–12. The hopes and expectations of one party, however, are insufficient to demonstrate the mutual intent of the parties. *Cf. Steinberg v. United States,* 90 Fed.Cl. 435, 444 (2009) (noting that mutual intent must be demonstrated by objective evidence). Not once did Mr. Higginbotham assert that there was a meeting of the minds with regard to the Utility Fees. *See* Pl.'s Exh. 3, Higginbotham Decl. *passim.* Even if the court found that there was an ambiguity in the terms of the Lease that made consideration of such parol evidence appropriate, nothing in the Higginbotham Declaration supports the assertion that the parties intended that the government would pay the Utility Fees.

In his declaration Mr. Higginbotham recognized the role that ECUA played in the operation of the Property as the third-party utility provider. *See id.* ¶ 10 (indicating that the government would have to pay Utility Fees only if required to do so by ECUA). Mr. Higginbotham hedged his own expectations, however, stating that he had requested that FEMA pay the Utility Fees "if required to do so by ECUA." *See id.* As demonstrated above in this Part III, "ECUA determined that [Utility Fees] would not be required at the present time." Sorrell Decl. ¶ 9. The court has no warrant to change the agreement between ECUA and the government regarding the Utility Fees. Retirement Communities cannot require the government to pay Utility Fees that ECUA did not require the government to pay.

The terms of the Lease unambiguously require the government to install and leave installed only the infrastructure that the government determined was necessary for the operation of temporary housing. Lease Rider ¶¶ 2–3; *see* Sorrell Decl. ¶ 9; Pl.'s Exh. 3, Higginbotham Decl. ¶ 10. ECUA did not require the government to pay the Utility Fees in order to receive utility services on the Property. *See* Sorrell Decl. ¶ 9. The terms of the Lease are unambiguous; the

terms of the Lease do not require the government to pay the Utility Fees. That is the end of the court's inquiry.

For the foregoing reasons, plaintiff's Motion is DENIED.

### B. Defendant's Motion for Summary Judgment

The government asserts that it has no obligation to pay Utility Fees, and that plaintiff's claim should be denied as a matter of law. Def.'s Mot. 1–2. Plaintiff bears the burden of establishing the elements of breach. *See Elec. & Missile,* 416 F.2d at 1355. Therefore plaintiff may not rest upon mere denials of allegations but must offer evidence sufficient to establish that a genuine issue of material fact exists on an issue for which it has the burden of proof. *See* RCFC 56(c)(1), (e).

The government states that "the plain language of the lease does not require that the Government pay [Utility Fees] ... because the lease is silent regarding that specific issue." Def.'s Mot. 6. Further, the government contends that regardless of whether Utility Fees are like utility bills, the government is not liable for the payment of the Utility Fees because the government never incurred liability for the Utility Fees during the Lease. *Id.* at 6–7. The government asserts that "[b]ecause ECUA determined that [Utility Fees] were not necessary for the operation of the temporary housing," the government is not required to pay Utility Fees to comply with the Lease. *Id.* at 7.

As the government notes, the Lease is silent regarding the specific issue of Utility Fees. Def.'s Mot. 6. Plaintiff asserts that the issue of Utility Fees is addressed by the provisions in the Lease making defendant "responsible for direct payment of all utility bills," and requiring defendant "to install the necessary water and sewer infrastructure." Pl.'s Resp. 3 (referring to Lease provisions). Plaintiff asserts that "[w]ithout the payment of these fees, no water and sewer services would have been provided to the Government-owned mobile homes placed on the Property to house victims of Hurricane Ivan." *Id.* Plaintiff's contention, that without the payment of Utility Fees there would be

no water and sewer services to the mobile homes, underscores the error of plaintiff's argument—ECUA continued to provide utility services to the Property after it returned the Utility Fees to Phillips & Jordan. *See* ECUA Board Report 1–2; Compl. ¶ 13.

The Lease required the government "to install sewer, water, [and] electrical utilities ... as may be necessary and/or convenient to establish and operate temporary housing facilities," and to "leave any infrastructure installed." Lease Rider ¶ 3; Lease Addendum A, ¶ F. ECUA continued to provide utility services to the Property after it determined that the government was not required to pay Utility Fees and returned the payment to Phillips & Jordan. *See* Sorrell Decl. ¶ 9. Because payment of Utility Fees was not required in order for ECUA to provide utility service to the Property, payment of Utility Fees was not "necessary and/or convenient to establish and operate temporary housing facilities." *See* Lease Rider ¶ 3.

Plaintiff argues that because the Lease required that the government leave all infrastructure installed, the government had to pay Utility Fees. Pl.'s Mot. 14. Even if the Utility Fees could be characterized as infrastructure, a contention the court finds counterfactual, they were not "installed" in such a way that the government was required to leave them "installed" at the end of the Lease. *See* Lease Addendum A, ¶ F. To comply with the Lease, the government was required only to install *necessary* infrastructure, *see* Lease Rider ¶ 3, and the Utility Fees were not necessary, *see* Sorrell Decl. ¶ 9. Individual pipelines to the mobile homes were necessary to provide utility service to the temporary housing facilities and the government installed individual pipelines and left them installed at the end of the Lease. *See* Tr. 5:23–25. Accordingly, the government fulfilled its obligation to install necessary infrastructure and to leave such infrastructure installed at the end of the Lease.

Plaintiff contends in a footnote that "the Government obtained an 18–month deferral, not a waiver of the required [Utility Fees]. The lease continued much longer than 18 months, however, the Government did not

honor the deferral agreement with the ECUA by paying the fees due and owing after 18 months." Pl.'s Resp. 6 n. 4. In his Declaration, Mr. Sorrell stated that the Utility Fees would be collected if the temporary housing connections were still present after 18 months. Sorrell Decl. ¶ 9; ECUA Board Report 1. The Lease lasted for 32 months, from October 2004 until May 2007, *see* Compl. ¶¶ 5, 14, but the Utility Fees were never collected. The parties are unable to explain definitively why the Lease was extended past its term, but agree that the government fulfilled all Lease obligations (other than, plaintiff contends, the payment of Utility Fees). *See* Tr. 59:3–60:22 (colloquy between the court, Mr. Reed and Mr. Shultis). ECUA may have violated its own rules when it failed to collect Utility Fees from the government after 18 months had elapsed. *Cf.* ECUA Board Report 1 (noting that ECUA would have to collect Utility Fees if site was still used for housing after 18 months). Nevertheless, it is undisputed that ECUA did not require the government to pay the Utility Fees during the duration of the Lease. The government is not required to pay plaintiff the cost of the Utility Fees now that the Lease, and the government's obligation to "operate temporary housing facilities" has ended.

For the foregoing reasons, defendant's Motion is GRANTED.

IV. Conclusion

The court finds it likely that plaintiff negotiated the Lease with the hope that ECUA would require the government to pay the Utility Fees, *see* Pl.'s Mot. 24 (citing Higginbotham Decl.), and believed, therefore, that it might benefit from the government's payment of the Utility Fees, *see* Pl.'s Exh. 3, Higginbotham Decl. ¶¶ 11–12. Plaintiff's hope that the government would pay the Utility Fees is insufficient to establish mutual intent of the parties and, in any event, the parties' intent is irrelevant to the resolution of the dispute because the language of the Lease is unambiguous. The Lease required the government to install infrastructure necessary to operate temporary housing, *see* Lease Rider ¶¶ 2–3, and, under ECUA's

rules, this did not include payment of Utility Fees, *see* Sorrell Decl. ¶ 9. The government was also required to leave any infrastructure installed, Lease Addendum A, ¶ B, and it complied with that requirement. ECUA determined that the government was not responsible for payment of the Utility Fees. Sorell Decl. ¶ 9. The court cannot require the government to pay the Utility Fees now when the government was not required to pay the Utility Fees during the term of the Lease.

For the foregoing reasons, plaintiff's Motion is DENIED and defendant's Motion is GRANTED. The Clerk of Court shall enter judgment for defendant. No costs.

IT IS SO ORDERED.